## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**RYAN WATERS**                                                               **PLAINTIFF**

**V.**                                   **CASE NO. 5:24-CV-5089**

**J.B. HUNT TRANSPORT SERVICES, INC.**                       **DEFENDANT**

### MEMORANDUM OPINION AND ORDER

### TABLE OF CONTENTS

I.  FACTS ..................................................................................................................2

II.  LEGAL STANDARD ..........................................................................................14

III.  DISCUSSION ....................................................................................................16

    A.  Evidentiary Issues .......................................................................................16

        1.  *2019 Meeting* .......................................................................................16

        2.  *Internal Investigation Notes* .............................................................21

        3.  *Spoliation Sanctions* .........................................................................21

    B.  Exhaustion ....................................................................................................21

    C.  Sex Discrimination .......................................................................................23

    D.  Retaliation ....................................................................................................23

IV.  CONCLUSION ...................................................................................................28

Now before the Court is Defendant J.B. Hunt Transport Services, Inc.'s Motion for Summary Judgment (Doc. 53). Plaintiff Ryan Waters filed a Response in Opposition (Doc. 62), and J.B. Hunt filed a Reply (Doc. 67). For the reasons that follow, J.B. Hunt's Motion for Summary Judgment is **GRANTED**. J.B. Hunt's outstanding Motions to Seal (Docs. 41 & 50) are also **GRANTED** and the Clerk's Office is **DIRECTED** to seal Docs. 3, 17, and 49.

Ryan Waters worked at J.B. Hunt for twenty-two years, climbing the ranks from fleet manager to high-level HR executive. Waters alleges that J.B. Hunt "actively engaged in hiring practices in favor of females," that he voiced his opposition to those practices, and that he was subjected to a string of discriminatory and retaliatory actions culminating in his termination in January of 2023. (Doc. 17, ¶¶ 14, 19–20). He asserts claims for sex discrimination and retaliation in violation of Title VII of the federal Civil Rights Act ("Title VII") and the Arkansas Civil Rights Act ("ACRA").[1] J.B. Hunt moves for summary judgment on all of Waters's claims.

## I. FACTS

Waters started working at J.B. Hunt in 2001. He remained there until his termination on January 13, 2023. In 2015, he lateralled into a technical role in the HR department, handling the company's Workday platform integration. (Doc. 62-1, p. 42:18–43:15 (Waters Depo.)). Waters climbed the ladder in HR and at the time of his termination he was serving as Vice President of People, "one of the highest level executives in HR."

---

[1] Waters also brought a claim for race discrimination under 42 U.S.C. § 1981 which the Court previously dismissed under Rule 12(b)(6). *See* Doc. 59.

*Id.* at p. 64:10–19.  The VP of People reported up to the Senior VP of People, and the Senior VP of People reported up to the Executive VP of People.

Waters's allegations of both sex discrimination and retaliation center around Shelley Simpson, another high-level executive at J.B. Hunt who, at the end of 2020, began serving as Executive VP of People, her first role in HR.  (Doc. 62-4, pp. 64:24–65:3 (Simpson Depo.)).  Waters had met and interacted with Simpson when she was Chief Commercial Officer and President of Highway Services, before she joined the HR department, although she was not his boss at that time.  *Id.* at pp. 63:19–25, 166:23–167:1.

Waters alleges that Simpson favored women and non-white candidates and employees, thereby discriminating against him as a white man.  Waters testified that, in December of 2018, Simpson told two Senior VPs in her department—which was not, at that time, HR—"to hire more diverse and that they need to hire more females and that their next hire is going to be females."  (Doc. 62-1, p. 154:16–20 (Waters Depo.)).  He also testified that Simpson wanted Waters's team to prepare personnel reports containing, among other things, demographics of new hires broken down by manager, which Waters found problematic.  *Id.* at p. 163:19–22.  Waters claims Simpson would use those reports in meetings with groups of managers in her department—again, not HR—"and they would be pinned against each other" about how many "diverse" hires they had made.  *Id.* at p. 162:12–24.  Later in his deposition, he admitted that the only such meeting he actually witnessed was the December meeting with the two Senior VPs, and he did not testify that the reports or the SVPs' respective demographic hiring percentages were mentioned.  *Id.* at p. 168:7–18.

3

Waters brought Simpson's December 2018 comment and his concerns about the reports to the attention of VP of Compliance Sherry Moncrief that same month. *Id.* at p. 170:1–6. Moncrief remembered the problem with the reports differently than Waters. She was concerned that Simpson wanted to disseminate the reports "lower and lower in the company," to people who did not have proper training in how to view demographic information and might "take it and show that we're discriminating in a particular manner." (Doc. 62-3, pp. 60:3–61:5 (Moncrief Depo.)). Moncrief did not think Simpson used the demographic data she requested in the reports to influence managers' hiring decisions. *Id.* at pp. 61:6–62:3, 79:24–80:12.

Waters testified that, because of the December 2018 comment and concerns about the reports, Moncrief brought in outside counsel to advise on hiring practices in the summer of 2019. (Doc. 62-1, pp. 158:10–23, 160:15–161:6, 169:20–25 (Waters Depo.)). Moncrief hired Roffman Horvitz, PLC, a law firm specializing in Office of Federal Contract Compliance Programs ("OFCCP") regulations. *Id.* at p. 158:10–23; Doc. 45-1, ¶ 3 (Horvitz Decl.). As a federal contractor, J.B. Hunt was required to comply with certain OFCCP requirements, including "evaluat[ing] selection rates for hires, promotions, and terminations." (Doc. 45-1, ¶ 6 (Horvitz Decl.); Doc. 62-3, pp. 78–79 (Moncrief Depo.)).

Alissa Horvitz and Scott Roffman met with Moncrief, Simpson, and Waters in July or November of 2019. *See* Doc. 62-1, p. 157:6–15 (Waters Depo.).[2] Waters's Amended Complaint and proposed second amended complaint (Docs. 17 & 35-1) discuss the conversation that occurred in that meeting. Waters also sought discovery of the report

---

[2] Waters testified that the meeting occurred in July, but records provided by Roffman Horvitz for the Court's in camera review indicate that the meeting occurred in November. The difference is not material to Waters's claims.

Roffman Horvitz prepared for that meeting. The Court held a hearing on this dispute on February 14, 2025. (Docs. 47 & 48). As explained *infra* section III.A.1, the Court finds that statements made in that meeting are privileged and cannot be used to support Waters's claims. They are therefore not discussed here.

In January of 2021, shortly after Simpson became Executive VP of People, she hosted a meeting with HR leadership where she asked why there were not more women in leadership. (Doc. 62-1, pp. 154:10–15, 192:22–193:5 (Waters Depo.)). In addition to Waters and Simpson, the meeting was attended by six men and three women in HR leadership. *Id.* at p. 193:8–12. At some point in summer 2021, Simpson made a comment about a training video on inclusion that there were "no white people" in the video. *Id.* at pp. 195:16–196:1. Simpson testified that she was criticizing the video because it was "missing two components of our employee population: White men and anyone who looked like they had wrinkles." (Doc. 62-4, p. 154:9–24 (Simpson Depo.)). Waters did not think Simpson was complaining about the absence of white people in the video. (Doc. 62-1, p. 195:16–196:19 (Waters Depo.)).

Later that year, Simpson was looking to hire a new Senior VP of People, the position directly above Waters. Waters applied for the promotion and alleges that he was not selected because of his gender. He testified that Simpson did not take his interview for the position seriously, instead focusing on "why [he] wasn't hiring more females in the organization" and why "[he] couldn't work for Grant Stephens," VP of Talent Management, who had also applied for the promotion. *Id.* at pp. 214:25–215:9. Waters was not chosen for the position. The three finalists were Grant Stephens, Karen Jewell, and Jessica Brooks. (Doc. 62-4, p. 121:8–10 (Simpson Depo.)). Jewell and Brooks were not from the

HR department.  (Doc. 62-1, pp. 200:14–23, 201:17–23 (Waters Depo.)).  Brooks had previously been a VP in sales working under Simpson.  *Id.* at p. 202:6–7.

On September 14, 2021, Simpson met with Waters and informed him that he was not one of the three finalists for the position.  *Id.* at p. 217:18–25.  Waters claims that this is the meeting that started the retaliation against him.  *Id.* at p. 270:6–21.  Waters secretly video recorded the meeting on his phone.  *Id.* at p. 217:7–16; Doc. 53-8.[3]  In his deposition, Waters testified that he "challenged [Simpson] . . . on the hiring process" during the meeting.  (Doc. 62-1, p. 270:6–23).  He later conceded that he did not challenge her promotion decisions as discriminatory but maintained that he challenged her about hiring the most qualified candidate, stating in his deposition:

> Q. [A]t no point actually, during this video, did you say to Ms. Simpson that you felt like the decision was discriminatory based upon your gender, did you?
>
> A. Yes. I did not. . . .
>
> Q. And at no time did you say that the decision that she had made have anything to do with your race, did you?
>
> A. No, I did not.
>
> * * *
>
> Q. What protected activity did you engage in?
>
> A. Challenging the hiring practices to Shelley Simpson on 9-14 of 2021. . . .
>
> Q. So the video—that you have contains . . . the challenge that you're talking about?

---

[3] Waters asserts without support that the video is inadmissible based on J.B. Hunt's concession that the *transcript* of the video is inadmissible.  (Doc. 62, ¶ 38).  Because Waters failed to state any grounds for his own video's inadmissibility, the Court will not exclude it from consideration on summary judgment.

A. I did challenge her on hiring the most qualified candidate.

*Id.* at pp. 225:4–14, 244:5–22.

The video shows that Waters asked Simpson why candidates who "don't really have any HR experience" were selected over HR executives like him. (Doc. 58, 27:00). Simpson responded that the two outside candidates had good strategic vision, leadership, and technical engineering backgrounds that could be helpful with improving HR's relationship with IT. *Id.* at 27:30. Both of the outside finalists were women, but Waters did not mention gender at any point in the meeting. Waters also expressed concern about working under Grant Stephens, the only male finalist and the only finalist with an HR background. Waters asked Simpson how she would ensure a safe workplace under Stephens since Stephens had previously punched him in the arm three times on one occasion and yelled at him on another. *Id.* at 38:50.

After that conversation, J.B. Hunt did not promote Stephens, and the position went to female applicant Jessica Brooks. Waters claims that after Brooks's promotion was announced, he was told by his subordinates that Brooks had not provided a resume in the Workday system, so Waters concluded that Brooks's selection was "predetermined[ ]." *Id.* at pp. 153:22–154:5, 187:4–188:4. Moncrief, a woman, also applied for the position but was not selected and felt that Brooks got "preferential treatment" because "she was known to be someone that Shelley [Simpson] liked." (Doc. 62-3, p. 21:3–13 (Moncrief Depo.)).

Waters claims that his outgoing boss Mark Greenway, a white man, retaliated against him for challenging Simpson by yelling at him during his 2021 performance review meeting in April of 2022. Notably, Greenway was yelling about Waters's statements about

7

Stephens, the male finalist, not the female finalists. (Doc. 62-1, pp. 149:24–150:3, 272:2–15 (Waters Depo.)). Waters also testified that he disagreed with his performance evaluation. Greenway had scored him at a 2 out of 5; Waters's self-assessment was a 2.4 out of 5. *Id.* at pp. 257:4–13. Waters said that he disagreed with the assessment because Simpson was setting his teams up for failure by not allocating enough hours or funds for the work they were expected to perform. *Id.* at pp. 257:16–258:5.

Brooks, as Senior VP of People, was Waters's direct supervisor after her promotion in fall of 2021 until his termination in January of 2023. Brooks reported up to Brad Hicks, Executive VP of People. (Doc. 62-1, p. 64:20–25 (Waters Depo.)). At some point in 2022, Waters informed Brooks about a technology issue where a "[software] integration was defaulting towards female," and she remarked, "That's the way it should be." *Id.* at p. 154:24–155:3.

On August 30, 2022, Brooks "yelled at and grabbed" Waters because Stephens was not on the list for and did not attend Moncrief's retirement party, and the next day she brought him into her office to yell at him again. *Id.* at pp. 150:17–19, 273:14–274:23. Moncrief, not Waters, was responsible for the list. *Id.* at p. 274:18–23. Then, Waters says, Brooks yelled at him because "she was told that [he] didn't want her to be in a position, that she wasn't qualified for the position." *Id.* at pp. 274:24–5. Waters felt that these incidents were also retaliation for standing up "against Shelley [Simpson] hiring Jessica [Brooks] to the position of senior vice president of HR." *Id.* at p. 276:6–11.

Waters also alleges that he was denied lateral opportunities because of his gender. In summer of 2022, two of the teams working under Waters were moved to the IT department, but Waters was not allowed to move with them. *Id.* at pp. 227:4–12, 230:5–

8

14.  Waters was told—it is not clear by whom—that "[he] could take the vice president of Compensation job or [he] could find a job elsewhere." *Id.* at p. 232:3–25.  Waters testified that Brooks was responsible for the decision or at least had to approve it and that he believed this was also "a form of retaliation for [him] speaking up" against Simpson.  *Id.* at pp. 232:7–21, 271:22–272:22.

On January 10, 2023, Brooks gave Waters a negative performance review for 2022 which Waters claims was not an accurate assessment of his performance.  *Id.* at pp. 262:19–263:6.  Waters testified that the only thing Brooks mentioned about his performance was him "cussing."  *Id.* at p. 243:6–11.  Based on the negative evaluation, Brooks told Waters that he would not be getting a raise or a stock bonus.  *Id.* at p. 267:8–10.  The next day, January 11, two lower-level employees in HR reported that Waters was having an affair with another lower-level HR employee.  (Doc. 53-4, p. 1).  On January 13, Waters was terminated.

As an employee at J.B. Hunt, Waters was subject to the company's Code of Ethical and Professional Standards and Fraternization Policy.  *See* Doc. 62-1, pp. 70:10–21, 144:7–154:6 (Waters Depo.); *id.* at pp. 477–490 (Code of Ethical and Professional Standards); *id.* at pp. 492–93 (Fraternization Policy).

The Code of Ethics contains the following provision on workplace relationships:

> Should a close personal relationship begin between two employees, both are required to advise either Human Resources or a manager in their chain of command. The Company will assess whether the relationship presents a conflict of interest for the business. Supervisors are prohibited from pursuing romantic or intimate relationships with employees they supervise.

*Id.* at p. 483.

The Fraternization Policy reflects the same general rule as the Code's workplace relationship standard, but with a bit more detail:

> It is the policy of J.B. Hunt to prohibit (1) romantic or intimate relationships between supervisors and their subordinates . . . and (3) behavior that may adversely affect morale, operations, and productivity because of favoritism, bias, or unfair treatment (or the appearance of favoritism, bias, or unfair treatment). In addition, J.B. Hunt strongly discourages supervisors from fraternizing with subordinates who are in their direct chain of command.
>
> Should a relationship begin between two employees, both will be required to advise either the Human Resources department or a manager in the employee's chain of command.
>
> * * *
>
> If any violation of this policy has caused or led to favoritism, unfair bias, harassment, or preferential treatment or has in any way adversely affected the company operation or productivity, more serious disciplinary action may be taken, up to an including termination of employment.

*Id.* at p. 492.

Finally, the Code contains a "Drug and Alcohol-Free Workplace" provision which states that "[g]iven the 'safety sensitive' nature of our work, it is essential that all employees are free from the effects of drugs and alcohol at work. If you suspect someone is under the influence while on the job, report it immediately." *Id.* at p. 481.

In November of 2022, Walters started a sexual relationship with Lauren Vaia, another employee in the HR department. Vaia was in a lower-level position than Waters but was not his direct report. Waters and Vaia were both married to other people at the time. Neither Waters nor Vaia reported the relationship. (Doc. 62-3, p. 53:3–14 (Moncrief Depo.); Doc. 62-1, pp. 107:1–10, 112:20–22, 137:13–139:13, 284:8–13 (Waters Depo.)).

On January 11, 2023, Harlee Hardcastle and Shelby Fox, two other less-senior employees in HR and friends of Vaia's, reported Waters and Vaia's relationship to Director of People Megan Perez. The next day, Perez informed Brooks of the relationship and involved members of J.B. Hunt's in-house legal team. The day after that, January 13, Perez, accompanied by counsel, met with Vaia, who denied the relationship. Perez asked

10

if they could see the text thread with Waters on Vaia's personal phone, but Vaia refused.
Vaia advised them that Fox had also started a romantic relationship with someone at the
company but outside the HR department.  (Doc. 53-4, pp. 1–3; Doc. 67-2, ¶ 2–3 (Perez
Affidavit)).[4]

Perez and the attorneys also met with Hardcastle and Fox individually.  Hardcastle
showed them texts between her and Waters about Vaia and photos from Waters of a bong
with marijuana.  Hardcastle "found it odd he'd often talk about how much he would smoke
during work hours."  *Id.* at p. 5.  The messages include:

- Thursday, November 17 at 8:13 AM: A picture of a bong with the message
  "Don't work to [sic] hard today bestie . . . Round 5 already." (Doc. 62-1, p. 415).

- Wednesday, November 23 at 7:51 AM: A picture of a bong sitting on top of an
  open laptop with the message "Morning bestie, working is hard, are you in the
  office?"  *Id.* at p. 420.

Waters has a medical marijuana prescription.  *Id.* at p. 322:6–7 (Waters Depo.).  Medical
marijuana use outside work did not violate company policy.  (Doc. 62-4, p. 149:17–25
(Simpson Depo.)).

J.B. Hunt also set an interview with Waters on January 13.  Waters admits that he
lied during the interview by denying his relationship with Vaia and that his behavior
violated the Code of Ethics.  (Doc. 62, ¶¶ 24, 27).  Bradley Hicks, Executive VP of People,
made the decision to terminate Waters.  (Doc. 53-5, ¶ 7 (Hicks Affidavit)).  Hicks attests
that the termination was based on the Fraternization Policy and the drug-related texts.
*Id.*  Both Waters and Vaia were terminated on January 13. (Doc. 62-1, p. 309:6–7 (Waters

---

[4] Waters argues that Perez's interview notes are inadmissible hearsay.  For the reasons
explained *infra* section III.A.3, the Court finds that J.B. Hunt could present the facts
contained in the notes in an admissible form at trial.

Depo.)). Waters asserts that the Policy was a mere pretext for discrimination because the Policy was "not enforced equally and consistently." (Doc. 62, ¶¶ 27, 32, 35).

Waters disclosed a long list of individuals at J.B. Hunt who he claims violated the Policy but were not terminated. *See* Doc. 57, pp. 3–6. Some of the employees on the list left the company upwards of ten years earlier. (Doc. 62-1, pp. 285:19–286:14 (Waters Depo.)). Many of the relationships that Waters alleges violated the policy but did not result in termination were familial, not romantic. *Id.* at pp. 287:17–288:24. Many of the romantic relationships involved employees of different departments. *See id.* at pp. 289:3–295:4. Waters was aware that several of the people on his list had, in fact, reported their relationships as required. *Id.* at pp. 299:23–301:13. Waters concedes that he was aware of at least two people on his list who had been terminated for violating the fraternization policy but had not, to his knowledge, engaged in any protected activity. *Id.* at p. 308:14–17.

There is only one person on the list who Waters alleges had a romantic relationship with a subordinate which they failed to report: Shelley Simpson. Simpson has been married to her husband David since 1997. (Doc. 62-4, p. 7:22–25 (Simpson Depo.)). In 2011, Shelley was promoted to Chief Marketing Officer which, Waters thought, meant David, as VP of Sales, reported to her. (Doc. 62-1, p. 286:15–22 (Waters Depo.)). Waters says that he heard from Moncrief that Simpson had not reported the relationship. *Id.* at p. 286:23–287:11. Waters did not know if Simpson had gotten approval from someone higher up the chain than Moncrief. *Id.* at p. 287:12–14. Moncrief, for her part, did not recall when or if Simpson had reported the relationship. (Doc. 62-3, p. 86:3–10 (Moncrief Depo.)). Simpson testified that she disclosed the relationship in 1996, the year it started,

12

and had received permission to continue the relationship because she was not in David's reporting structure.  (Doc. 62-4, p. 141:2–142:15 (Simpson Depo.)).

Waters filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 22, 2023.  (Doc. 53-7).  It alleges sex discrimination and retaliation and lists the dates of discrimination as beginning and ending January 13, 2023, the date of his termination.  The relevant narrative portions of the Charge are as follows:

> During the last year of my employment, I expressed my disagreement with the promotion and hiring practices by the President, and how they were discriminatory on its face. I was asked for my personal cell phone to scan, and I offered to do it, but after I consulted with my attorney. I was discharged shortly thereafter on January 13, 2023.
>
> * * *
>
> I believe I was treated differently in the terms of my employment and discharged from the position of Vice President of People because of my sex (male) in violation of Title VII . . . ; and in retaliation for expressing my opinion about the hiring and promotion practices of the company.

*Id.*

Waters filed this lawsuit March 15, 2024. (Doc. 3, p. 6).  On June 20, 2024, J.B. Hunt propounded a discovery request for Waters's text messages with Vaia.  (Doc. 53-11, No. 9).  Waters refused to produce the texts, and J.B. Hunt sent a good faith letter on September 12, 2024.  (Doc. 53-12).  Waters produced only sixteen screenshots from 2024, but not the texts J.B. Hunt sought from around the time of his termination.  (Doc. 62, ¶ 44).  Waters was deposed about a month after J.B. Hunt's good faith letter.  (Doc. 62-1).

Waters revealed in his deposition that he had actually been using three different phones to communicate with Vaia.  The Court will refer to these phones as the old phone, the new phone, and the burner phone.  Waters had been using the old phone during his

employment at J.B. Hunt and continued to until around August or September of 2024, when he purchased and moved his SIM card over to the new phone. *Id.* at p. 82:4–15. He held onto the old phone, but it was no longer functional as a cell phone. *Id.* at p. 81:9–18. Immediately following his termination, Waters purchased the burner phone which he used exclusively to communicate with Vaia. *Id.* at pp. 73:3–19, 84:11–15. Waters sold the burner phone in January of 2024. *Id.* at p. 83:2–14. He did not save the burner phone's data. *Id.* at p. 83:15–16.

Three weeks before his deposition, Waters lost the old phone in the Black River. *Id.* at pp. 78:20–23; 100:6–17. He had taken the old phone with him on a solo duck hunting trip—before the start of duck season—because, he claimed, he needed to use the map on the old phone. He testified that the map could not be transferred to the new phone but was still functional on the old phone, even without a cell connection. *Id.* at p. 101:16–103:12. Waters testified both that he was unable to use the old phone during the trip because of "a bad power source," *id.* at pp. 80:21–81:5, and that he had been using the phone to look at the map when he dropped it in the river, *id.* at p. 103:13–20.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Nat'l Bank of Com. of El Dorado v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999) (quoting Fed. R. Civ. P. 56). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict

for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995).

"To be material, a fact must 'affect the outcome of the suit under the governing law.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1052 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient' to survive summary judgment." *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Liberty Lobby*, 477 U.S. at 252). The moving party bears the burden of proving the absence of any material factual disputes and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 256; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The Court must base its determination of whether a genuine issue of material fact exists on "evidence that will be admissible at trial. [T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it could be presented at trial in an admissible form." *Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019) (alteration in original) (internal quotations and citations omitted). When video footage "blatantly contradicts" the non-movants account of events such that "no reasonable jury could have believed him," courts should not "rel[y] on such visible fiction" and must instead "view[ ] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

15

## III. DISCUSSION

Waters claims that he was subject to sex discrimination and retaliation while employed at J.B. Hunt and when he was terminated for violating a policy that he claims was not consistently enforced.  J.B. Hunt argues that claims related to alleged adverse employment actions prior to Waters's termination were not timely raised or administratively exhausted.  With respect to Waters's termination, J.B. Hunt argues that Waters has failed to produce direct evidence of discrimination or to make out a prima facie case.  It further argues that it has offered a legitimate, non-discriminatory reason for Waters's termination which Waters cannot show is pretextual.  The Court first takes up the parties' evidentiary issues, before addressing exhaustion and timeliness, and finally the merits of Waters's sex discrimination and retaliation claims.

### A. Evidentiary Issues

#### 1. 2019 Meeting

J.B. Hunt asserts that any statements made in the 2019 meeting with Roffman Horvitz that Waters attended are protected by the attorney-client privilege, are therefore inadmissible, and should not be considered on summary judgment.  The company also moves to seal Waters's Complaint (Doc. 3), his Amended Complaint (Doc. 17), and the Court's Order on Waters's Motion for Leave to File Second Amended Complaint (Doc. 49), which all reference a statement allegedly made in that meeting.  Waters previously sought discovery of a report discussed in this meeting, and the Court held a hearing on February 14, 2025, at which it ordered briefing on the privilege issue with respect to both the report and statements made in the meeting.  (Docs 47 & 48).  Assuming *arguendo* that these items from over three years before Waters's termination are relevant, the Court

16

finds that they are subject to attorney-client privilege and therefore could not be presented in an admissible form at trial.

"The attorney-client privilege protects confidential communications between a client and his attorney made for the purpose of facilitating the rendering of legal services to the client." *United States v. Beckman*, 787 F.3d 466, 482 (8th Cir. 2015) (internal quotations and citation omitted). "[C]orporations, like individuals, enjoy the protections of the attorney-client privilege." *Citibank, N.A. v. Andros*, 666 F.2d 1192, 1195 (8th Cir. 1981). Waters concedes that he cannot waive J.B. Hunt's privilege. And he does not dispute that J.B. Hunt had an attorney–client relationship with Roffman and Horvitz at the time of the meeting, nor that the meeting "contained some privileged information." (Doc. 52, p. 3 (emphasis omitted)). He instead argues that Simpson's statements were outside the scope of the privilege. Waters relies on the *Diversified Industries* test, but the Court finds that only some of its elements are applicable here.

*Diversified Industries* sets out a five-element test for the privilege's applicability to a corporate employee:

> (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

*Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 609 (8th Cir. 1977). The case was decided before the Supreme Court rejected the "control group" test, adopted by some courts, which limited the privilege's applicability to communications between attorneys and those "officers and agents . . . responsible for directing [the company's] actions in

response to legal advice." *Upjohn Co. v. United States*, 449 U.S. 383, 391 (1981) (alterations in original). The Eighth Circuit had also rejected the control group test in *Diversified Industries*, in favor of its five-element test above, but that test was crafted to address the issue of communications with lower-level employees outside the control group. *See Jacobson Warehouse Co. v. Schnuck Markets, Inc.*, 13 F.4th 659, 676 (8th Cir. 2021) (emphasis added). Simpson was not a lower-level employee in 2019; she was Chief Commercial Officer and President of Highway Services. (Doc. 62-4, p. 63:19–64:2 (Simpson Depo.)). Therefore, the Court does not consider the second and third elements, as a corporate executive need not act at the direction of a superior in order to secure legal advice on behalf of the corporation.

The first element is that the communication be made for the purpose of securing legal advice. This includes both "the giving of professional advice to those who can act on it" and "the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981). Generally, the party asserting the privilege bears the burden of proving its applicability. However, "when a matter is committed to a professional legal advisor, it is 'prima facie committed for the sake of legal advice and [is], therefore, within the privilege absent a clear showing to the contrary.'" *In re Bieter Co.*, 16 F.3d 929, 938 (8th Cir. 1994) (second alteration in original). Here, J.B. Hunt has provided an affidavit from Horvitz, who attests that she and her partner met with Simpson, Moncrief, and Waters to answer questions and render legal opinions about J.B. Hunt's data practices and compliance with OFCCP regulations. (Doc. 45-1, ¶¶ 6–7). Waters has offered no evidence to the contrary. The Court therefore finds that the report and Simpson's statements in the meeting were communications made for

the purposes of giving legal advice and giving the information necessary to render such advice, respectively.

Next, the subject matter of the communication must be within the scope of the employee's corporate duties. As a federal contractor, J.B. Hunt was subject to myriad federal regulations, including those around evaluating its hiring practices. The federal government is an important customer, and it is well within the Chief Commercial Officer's duties to keep that customer happy and ensure the corporation is not running afoul of federal law. Meeting with OFCCP counsel to discuss hiring practices and reporting was within the scope of Simpson's corporate duties.

Finally, the communication must not be disseminated beyond those employees who need to know its contents, i.e., it must be kept confidential. The meeting at issue was attended by Simpson, Moncrief, and Waters. During the meeting, Waters witnessed Horvitz give the report to Simpson. He did not receive a copy. (Doc. 62-1, p. 184:25–185:20 (Waters Depo.)). The report was marked "privileged and confidential." Simpson's statements in the meeting were also not disseminated beyond need-to-know employees. Moncrief, as VP of Compliance, was present for obvious reasons. And Waters attended the meeting because his team was responsible for the data analytics that were the subject of OFCCP regulations. (Doc. 62-1, p. 160:5–20 (Waters Depo.)). There is no indication that the reports or Simpson's statements were disseminated beyond the confines of the meeting.

The Court does not accept Waters's crabbed interpretation of the attorney–client privilege. A person consulting with a lawyer may not know precisely what information is of legal significance to the advice sought. This is doubly true in the corporate context,

19

where an employee is conveying information in order that the corporation, rather than the employee, may benefit from the advice of counsel. "It is for the lawyer in the exercise of his independent professional judgment to separate the relevant and important from the irrelevant and unimportant." *Upjohn*, 449 U.S. at 391 (quoting Model Code of Pro. Resp. EC 4–1 (A.B.A. 1980)).

"[F]or the attorney-client privilege to be effective, it must be predictable." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 183 (2011). "[I]f the purpose of the attorney–client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Upjohn*, 449 U.S. at 393. Employees speaking with their corporate employers' attorneys cannot be expected to guess, at the corporation's peril, whether the privilege will attach from one sentence to the next. The purpose of the privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* at 389. This purpose would be significantly undermined by allowing disgruntled former employees to cherry pick statements of former co-workers during closed-door meetings with corporate counsel for use as a sword in subsequent litigation.

J.B. Hunt's Motions to Seal (Docs. 41 & 50) are **GRANTED**. The Clerk's Office is **DIRECTED** to seal Plaintiff's Complaint (Doc. 3) and Amended Complaint (Doc. 17) and the Court's February 24, 2025 Order (Doc. 49). J.B. Hunt is **DIRECTED** to email the Court copies of the above with its desired redactions.

20

### 2. Internal Investigation Notes

Waters asserts that Perez's notes from her internal investigation of Water's relationship (Doc. 53-3) are inadmissible hearsay within hearsay. J.B. Hunt responds that the notes are not being offered for their truth but instead to show that J.B. Hunt was put on notice of Waters's relationship, that it engaged in an investigation, and that it relied on the information obtained in its decision to terminate Waters. Moreover, it argues that, even if the notes themselves are inadmissible, it can present the same information via the testimony of Perez, Fox, Hardcastle, and Brooks. The Court agrees that J.B. Hunt would be able to introduce evidence of the report and subsequent investigation in some admissible form at trial.

### 3. Spoliation Sanctions

In addition to its seeking summary judgment under Rule 56, J.B. Hunt also seeks dismissal as a spoliation sanction under Rule 37(e) based on Waters's failure to preserve electronically stored information on the old phone and the burner phone. (Doc. 54, pp. 19–21). J.B. Hunt does not request any remedy other than dismissal for the alleged spoliation. Because the Court finds for J.B. Hunt on the merits, it need not and does not address the spoliation question.

### B. Exhaustion

Waters alleges that J.B. Hunt took various adverse actions against him prior to his termination, e.g., failure to promote, refusal to transfer. J.B. Hunt argues that Waters cannot rely on any alleged adverse actions other than his termination because he failed to raise them in his Charge of Discrimination filed with the EEOC. (Doc. 54, p. 17 n.3). Waters does not attempt to rebut this argument in his Response, although he continues

to point to alleged adverse employment actions other than his termination. *See* Doc. 62, pp. 13, 28, 30.

"Under Title VII, a plaintiff must first exhaust his administrative remedies before filing suit in federal court." *Lindeman v. Saint Luke's Hosp. of Kansas City*, 899 F.3d 603, 608 (8th Cir. 2018). Waters's Charge of Discrimination lists the dates of discrimination as beginning and ending January 13, 2023, the date of his termination and references only his termination. (Doc. 53-7).

In the absence of any argument by Waters as to why actions other than his termination are within the scope of his EEOC Charge, the Court finds that Waters failed to exhaust administrative remedies for Title VII claims based on alleged adverse employment actions other than his termination. *See Ross v. City of Independence*, 76 F. App'x 108 (8th Cir. 2003) (per curiam).[5]

The ACRA, however, does not have an exhaustion requirement although it does have a limitations period for employment claims: one year after the alleged discrimination or ninety days after receipt of a "Right to Sue" letter from the EEOC, whichever is later. Ark. Code Ann. § 16-123-107(c)(4). A plaintiff cannot rely on an untimely EEOC charge to extend the statute of limitations. *Burkhart v. Am. Railcar Indus., Inc.,* 603 F.3d 472, 475 (8th Cir. 2010). Waters filed suit on March 15, 2024, more than a year after his termination. (Doc. 3, p. 6). The statute of limitations is an affirmative defense which J.B. Hunt has only raised with respect to Waters's pre-termination allegations. (Doc. 67, pp.13–14). The allegedly discriminatory failure to promote him to SVP occurred in fall of

---

[5] The Court also notes that many of the alleged adverse actions, including the challenged promotion decision in fall of 2021, occurred well outside the 180-day period for timely filing a charge with the EEOC. 42 U.S.C. § 2000e-5(e)(1).

2021. (Doc. 62-1, p. 152:15–22). He also alleges that his teams were taken away from him in summer of 2022, and that his supervisors yelled at him in April and August of 2022. *Id.* at pp. 148:18–22, 149:24–150:1, 150:17–19. Finally, he alleges that he was falsely given a negative performance review and denied a raise and stock shortly before his termination on January 10, 2023. *Id.* at p. 150:19–23. All of these events occurred more than a year before Waters filed suit and none were raised in his EEOC charge. Therefore, they are time-barred under the ACRA.

## C. Sex Discrimination

Title VII makes it "an unlawful employment practice for an employer" to "discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). Title VII and ACRA sex discrimination claims are analyzed under the same legal framework. *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009). Waters devotes less than a page of his Response to opposing J.B. Hunt's argument with respect to his gender discrimination claim. (Doc. 62, pp. 29–30). He argues that he has presented direct evidence that Simpson failed to promote him because of his gender. *Id.* This claim was not administratively exhausted. Regarding his termination, Waters has failed to set out specific facts showing any connection between his gender and his termination. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 734–35 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."). His gender discrimination claims are, accordingly, **DISMISSED**.

## D. Retaliation

"Title VII prohibits retaliation against an employee 'because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a

23

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'" *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1020 (8th Cir. 2011) (alterations in original) (quoting § 2000e-3(a)). Like discrimination claims, Title VII and ACRA retaliation claims are examined under the same legal framework. *Brown v. City of Jacksonville*, 711 F.3d 883, 892 (8th Cir. 2013). "To defeat summary judgment, a plaintiff must produce either direct evidence of discrimination or create an inference of it under the *McDonnell Douglas* burden-shifting framework." *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011) (citation omitted).

Waters has not offered direct evidence of retaliation, so the Court instead proceeds under *McDonnell Douglas*. The plaintiff bears the initial burden of establishing a prima facie case by showing: (1) he engaged in protected conduct; (2) the employer took an adverse action against him; and (3) there was a causal connection between the adverse action and the protected activity. *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 740 (8th Cir. 2017). Once the plaintiff makes out a prima facie case, the burden "shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* "If the employer articulates a legitimate reason for the adverse employment action, the plaintiff may create a triable question as to retaliation by showing the employer's articulated reason was not the true reason for the adverse action," i.e., the reason offered is pretextual. *Id.*

J.B. Hunt argues that Waters failed to prove he engaged in protected conduct or that there was a causal connection between the alleged protected conduct and his termination. It also argues that Waters has no evidence that the company's offered justification for his termination is pretextual.

24

Waters claims that he engaged in protected conduct by challenging Simpson's hiring practices during the September 14, 2021, meeting where she informed him that he was not a finalist for the Senior VP position. (Doc. 62-1, p. 244:5–22 (Waters Depo.)). His "challenge" to Simpson's decision did not mention the race or gender of the finalists. Indeed, much of the conversation was devoted to his opposition to white male candidate Grant Stephens. An employee may challenge his employer's promotion practices for any number of reasons, but only a challenge to promotion practices that the employee claims discriminate based on "race, color, religion, sex, or national origin" will support a Title VII retaliation claim. 42 U.S.C. § 2000e-2(a); *see id.* §2000e-3(a). Because Waters's challenge to Simpson's promotion decision did not mention any of these characteristics, he was not engaged in protected conduct. *See Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028–29 (8th Cir. 2002) (no protected conduct where employee "complained that she was entitled to a pay increase and a change in job title" but "did not attribute [her employer's] failure to give her a raise or a promotion to sex discrimination"); *Smith v. Int'l Paper Co.*, 523 F.3d 845, 849–50 (8th Cir. 2008) (no protected conduct where employee reported his supervisor "yelling, cussing and hollering at [him], with no reference to race, color, or national origin" (cleaned up)); *Kempf v. Hennepin Cnty.*, 987 F.3d 1192, 1196 (8th Cir. 2021) (no protected conduct where employee "never indicated to her employer that [her supervisor's harassing] conduct was overtly sexual or gender based").

Waters cannot make out the requisite causal connection, either. While the passage of time between events may not foreclose a retaliation claim, a plaintiff generally must present some additional evidence of causation even when there is a close temporal connection. *Cheshewalla v. Rand & Son Const. Co.*, 415 F.3d 847, 852 (8th Cir. 2005).

25

Here, Waters attempts to create a chain of retaliatory actions to connect his September 2021 comment with this January 2023 termination.  The first of the "series of events" against Waters was Mark Greenway yelling at him during his performance evaluation seven months later in April 2022.  This is far too long to support an inference that retaliation was the reason for Waters's termination.  *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133, 1138 (8th Cir. 2006) ("We have held that an interval as brief as two months did not show causation for purposes of establishing a retaliation claim, and that a two-week interval was 'sufficient, but barely so.'" (citations omitted)).  Moreover, the discovery of his relationship with Vaia in the days before his termination would "erode[ ] any causal connection" that could have been suggested by temporal proximity.  *Cheshewalla v. Rand & Son Const. Co.*, 415 F.3d 847, 852 (8th Cir. 2005).

Finally, even assuming Waters could establish a prima facie case, the Court agrees that he would not be able to show that J.B. Hunt's offered reasons for his termination—violations of the fraternization and drug use policies—were pretextual.  There are a number of ways an employee can demonstrate pretext.  One way, the one relied upon by Waters, is by showing that "similarly situated employees who did not engage in the protected activity were treated more leniently."  *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014) (citation omitted).  At the pretext stage, the plaintiff must meet the "rigorous standard" of proving that the comparators are "similarly situated in all relevant respects."  *Torgerson*, 643 F.3d at 1051 (internal quotations and citation omitted).  Waters has not met that standard here.

Waters claims that he "identified nearly 100 individuals, most of whom never were disciplined under the [fraternization] policy."  (Doc. 62, p. 29).  Waters has not presented

26

any evidence, however, that these hundred individuals *violated* the policy but were retained—just that they had relationships with co-workers that required disclosure under the policy.  He pointed to only one comparator, Simpson, who he claimed had failed to disclose her relationship, but admitted when pressed that he did not actually know whether or not she had reported it. *See* Doc. 62-1, pp. 286:15–287:14 (Waters Depo.). What's more, there is no evidence in the record that any of these individuals lied about their relationships when asked or were texting lower-level employees about marijuana during business hours.  Waters admits that he engaged in a sexual relationship with a subordinate, did not disclose the relationship, and lied about it when confronted.  He also admits that he texted another subordinate pictures of his bong.  Although he denies actually getting high during the workday, his texts send a different message.  He has not met his burden to show that similarly situated employees who did not engage in protected conduct were treated more leniently.

But even if the Court were to relax the standard for similarly situated comparator and accept these individuals as evidence of pretext, Waters "still must present sufficient evidence to meet [his] ultimate burden of proof and persuasion that [J.B. Hunt] unlawfully retaliated against [him]." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 978 (8th Cir. 2012) (internal quotations and citation omitted).  J.B. Hunt has deftly explained why Waters failed to meet that burden here:

> Boiled down to its essence, Plaintiff's argument must be that J.B. Hunt was lying in wait for more than a year for Plaintiff to start having a sexual relationship with a subordinate without disclosing it, for employees with no knowledge of any protected activity to report the relationship, for Plaintiff to lie about the relationship when asked, and for Plaintiff to send pictures of drug paraphernalia and other inappropriate messages to another subordinate, just so that it could retaliate against him for what Plaintiff believes was some kind of protected activity.

(Doc. 67, p. 2).  No reasonable jury could conclude that retaliation was the real reason for Waters's termination.  For all these reasons, Waters's retaliation claims are **DISMISSED**.

## IV.  CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that J.B. Hunt's Motions to Seal (Docs. 41 & 50) and its Motion for Summary Judgment (Doc. 53) are **GRANTED**.  The case is **DISMISSED WITH PREJUDICE**.  The Clerk's Office is **DIRECTED** to seal Docs. 3, 17, and 49.

**IT IS SO ORDERED** on this 30th day of May, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

28